NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

STARR SURPLUS INSURANCE
COMPANY and STARR INDEMNITY &
LIABILITY COMPANY,

          Plaintiffs,

v.

ZIEGENFUSS DRILLING, INC.,

          Defendant.

Civil Action No. 24-8221 (RK) (JBD)

**OPINION**

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon cross motions for summary judgment filed by Plaintiffs Starr Surplus Lines Insurance Company and Starr Indemnity and Liability Company (collectively, "Plaintiffs") ("Pls. MSJ," ECF No. 18-16; ECF No. 18) and Defendant Ziegenfuss Drilling, Inc. ("Defendant") ("Def. MSJ," ECF No. 36[1]; ECF No. 38). Plaintiffs opposed Defendant's motion. ("Pls. Opp.," ECF No. 37-1.[2]) The parties also submitted statements of material facts in support of their respective motions ("P-SOF," ECF No. 18-1; "D-SOF," ECF No. 36-1 at 5–9[3]) and responses thereto ("Resp. to D-SOF," ECF No. 37; "Resp. to P-SOF," ECF No.

---

[1] Defendant's cross motion brief also serves as an opposition brief to Plaintiffs' motion. (*See generally* Def. MSJ.)

[2] This second brief from Plaintiffs is both an opposition to Defendant's cross motion and a reply brief in support of Plaintiffs' own motion for summary judgment. (*See generally* Pls. Opp.)

[3] Defendant included its "Counter Statement of Material Facts" within the same document as its response to Plaintiffs' statement of material facts. (*See generally* ECF No. 36-1.) The Court references Defendant's counter statement of material facts by paragraph number beginning on page 5 of ECF No. 36-1.

36-1 at 1–5[4]). The Court has considered the parties' submissions and resolves the pending motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. Here, Defendant's liability is clear and uncontested, and the amount owed is not seriously in doubt and well-established. There is no genuine issue of material fact. Accordingly, for the reasons set forth below, Plaintiffs' motion for summary judgment is **GRANTED**.

## I.      BACKGROUND

This case centers on a dispute between the Plaintiffs (two insurance companies) and their insured, Defendant company, related to Defendant's premiums due under three separate contracts—brought as three separate counts for breach of contract in Plaintiffs' Complaint. (*See generally* ECF No. 1.) On the instant motions for summary judgment, Defendant only contests its obligations with respect to Count I, Defendant's claim for breach of the 2021 General Liability Policy ("2021 GL Policy") it was issued by Plaintiff Starr Surplus Lines Insurance Company ("Starr Surplus"). (*See* D-SOF ¶ 16 ("The dispute giving rise to Starr's Motion for Summary Judgment concerns Starr's audit process, reversal of its agreement, and calculation of the final premium *under the 2021 General Liability Policy, not the existence of audit provisions generally or the performance of audits under other policies*." (emphasis added)); Def. MSJ at 2; "2021 GL Policy," ECF No. 18-7[5].) Hence, as set forth below, summary judgment shall issue in favor of Plaintiffs and against Defendant as to Counts II and III.

### A.      THE 2021 GENERAL LIABILITY POLICY DISPUTE

On June 22, 2021, Plaintiff Starr Surplus issued the signed 2021 GL Policy to Defendant

---

[4] The Court references Defendant's responses to Plaintiffs' statement of facts by numbered paragraph beginning on page 1 and ending on page 5 where Defendant's counter statement of material facts begins. (*See* ECF No. 36-1.)

[5] Because the 2021 GL Policy is not consecutively paginated, the Court refers to the document by the PDF page number as it appears in ECF No. 18-7.

to cover the time period for June 1, 2021 to June 1, 2022.[6] (2021 GL Policy at 6–9; P-SOF ¶ 1; Resp. to P-SOF ¶ 1.) The policy—a surplus lines insurance policy[7]—insured various portions of Defendant's "commercial[, ] industrial rock & boulder drilling business" for the coverage period, and required Defendant to pay an initial deposit premium of $310,000.[8] (2021 GL Policy at 6; P-SOF ¶ 2; Resp. to P-SOF ¶ 2.) To determine the final premium amount owed at the end of the policy period, the 2021 GL Policy required Defendant to undergo an annual audit, which calculated Defendant's final premium based on its payroll. (P-SOF ¶¶ 3–5, 7; Resp. to P-SOF ¶¶ 3–5, 7.) The payroll amount was determined "in accordance with [Starr Surplus'] General Liability Insurance Manual's rules respectively for the states in which [the insured has] employment."[9] (2021 GL

---

[6] As is relevant to resolving the instant motions, the 2021 GL Policy's "Common Policy Conditions" contain (1) an integration clause and (2) a specific process for future modifications of the policy: "This policy *contains all the agreements between you and us concerning the insurance afforded.* The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived *only by endorsement issued by us and made a part of this policy.*" (2021 GL Policy at 14 (emphasis added).)

Furthermore, although not contested by the parties, the Court concludes that New Jersey law applies to the interpretation of the various insurance contracts at issue. *See Shannon v. B.L. England Generating Station*, No. 10-4524, 2013 WL 6199173, at *5 n.3 (D.N.J. Nov. 27, 2013) ("The terms of an insurance policy are interpreted according to New Jersey law in connection with its coverage of a New Jersey risk.").

[7] "A surplus lines insurer insures risks which licensed insurers are unwilling to accept. Upon a determination by the State Commissioner of Insurance that no licensed market for the risk exists, an insurance broker or agent licensed under the surplus lines law may then place the risk with a surplus lines insurer . . . which is not otherwise licensed or authorized to do business in the state in which the risk is located." *United States v. Northumberland Ins. Co., Ltd.*, 521 F. Supp. 70, 72 n.3 (D.N.J. 1981).

As Defendant asserts, the 2021 GL Policy did not include a "surplus lines notice advising that the insurance was issued pursuant to surplus lines laws, is not subject to state supervision, or is not protected by any state guaranty fund." (D-SOF ¶ 22; Resp. to D-SOF ¶ 22.) However, the insurer is not obligated to provide this surplus lines notice. *See* N.J. Admin. Code. § 11:1–33.3(a)(4) (requiring a "producer" to "place upon the policy, or provide as a stand alone notice" the required surplus line notice); *id.* § 11:1–33.2 (defining "Producer" as "an insurance agent, insurance broker or insurance consultant" and distinguishing a "Surplus lines insurer" as "a foreign or alien insurer that is eligible to transact surplus lines business in this State"); *cf* N.Y. Ins. Law § 2118(e)(2)(C) (placing obligation on broker).

[8] The scope of coverage and nature of the insurance policies are not at issue for any of the three contract claims. (*See generally* ECF No. 1; Pls. MSJ; Def. MSJ.)

[9] Despite admitting that the 2021 GL Policy contains the specific language quoted above, Defendant denies as "overbroad and vague" Plaintiffs' assertion that Starr Surplus "uses the Insurance Services Offices, Inc's General Liability Manual to determine the remuneration that should be included in the premium calculation

Policy at 65; P-SOF ¶ 8; Resp. to P-SOF ¶ 8.) Furthermore, as set forth in the "Composite Rating Plan Premium Endorsement," Defendant's amount due following a payroll audit was state-specific: Defendant owed Starr Surplus a premium based on Defendant's payroll in (1) New York and (2) all other states besides New York at a specified rate per $1,000 of payroll.

| State | Composite Rate Per $1,000 of Payroll |
|---|---|
| New York | $1,010.7408[10] |
| All Other States Besides New York | $220.6272 |

(2021 GL Policy at 64; P-SOF ¶ 7; Resp. to P-SOF ¶ 7.)

Subject to these rates, Plaintiff Starr Surplus's third-party audit vendor, Sedgwick,[11] conducted the first three rounds of audits of Defendant's books and records under the 2021 GL

---

for general liability policies." (*See* Resp. to P-SOF ¶ 6; P-SOF ¶ 6.) Not only is Defendant's denial arguably inconsistent with its later admission noted above that the 2021 GL Policy contains specific reference to this manual, but Defendant offers no citation "to the affidavits and other documents" in the record to support its denial. (*Id.* ¶¶ 6, 8); L. Civ. R. 56.1(a). "When parties attempt to dispute (or fail to dispute) a fact asserted and supported from the record without supporting their position with a citation to the record, such assertions are insufficient to create an actual dispute of fact. The Court will regard these paragraphs as undisputed for purposes of this Motion." *Bobo v. Wildwood Pub. Schs. Bd. of Educ.*, No. 13-5007, 2017 WL 1416775, at *1 n.1 (D.N.J. Apr. 20, 2017). Accordingly, although no party provides the referenced "General Liability Manual" as an exhibit to the cross motions, the Court concludes that there is no genuine dispute of material fact that Starr Surplus uses this manual to determine remuneration in premium calculations for general liability policies.

[10] Defendant states that this New York payroll rate was "significantly higher" than the general liability payroll premium rate it was charged in the coverage years before and after the 2021 GL Policy. (*See* D-SOF ¶¶ 18–20.) Defendant argues that this dramatic and unreasonable increase in premiums suggests—in combination with Plaintiffs' other conduct described herein—that Plaintiffs acted in bad faith. (Def. MSJ at 8–9.) As an initial matter, Plaintiffs did not provide Defendant with its previous 2020-2021 general liability insurance coverage at all, and Defendant neglected to attach that policy with its summary judgment submissions. (Resp. to D-SOF ¶ 19; D-SOF ¶ 19 (referencing an "Ex. D" that is not attached to the relevant declaration).) Defendant's assertion about Plaintiffs' supposedly unreasonable price increase is insufficient to create a genuine dispute of material fact about Defendant's obligations under the 2021 GL Policy. Starr Surplus was entitled to charge the rate it did to insure Defendant's dangerous business practices as a matter of law. *See Evanston Ins. Co., Inc. v. Merin*, 598 F. Supp. 1290, 1298 (D.N.J. 1984) ("Surplus lines insurers, however, may charge any rate the market will bear, so long as it does not fall below the lowest rate offered by an admitted or authorized insurer.").

[11] Sedgwick is not a party to the instant suit.

4

Policy. (P-SOF ¶ 9; Resp. to P-SOF ¶ 9.) At first, Plaintiffs themselves were not meaningfully involved in the audits. (D-SOF ¶¶ 1, 8 ("Up to and including the issuance of the third revised audit, audit calculations were prepared by Sedgwick, and Starr relied on Sedgwick's review process and did not conduct a full, independent review of the underlying records before audit results or invoices were issued."); Resp. to D-SOF ¶¶ 1, 8.)

On May 5, 2023, Sedgwick issued its initial audit, concluding that Defendant owed an additional premium of $234,301.20 under the 2021 GL Policy above its $310,000 initial deposit. (D-SOF ¶ 2; Resp. to D-SOF ¶ 2.) Defendant, however, identified errors in Sedgwick's calculations related to "improper inclusion of fringe benefits, per diem payments, and officer salaries." (D-SOF ¶ 3; Resp. to D-SOF ¶ 3.) Sedgwick revised its audit accordingly, and on July 3, 2023, issued a second audit lowering the additional premium demand to $200,725. (D-SOF ¶ 4; Resp. to D-SOF ¶ 4.) Defendant, again, identified errors in Sedgwick's second set of calculations, "including the misclassification of an employee as an officer and the continued inclusion of taxable per diem payments." (D-SOF ¶ 5; Resp. to D-SOF ¶ 5.) So, Sedgwick tried again. On or about October 20, 2023, Sedgwick issued a third revised audit of Defendant's payrolls, calculating payrolls of $279,008 in New York and $763,862 in states excluding New York, which resulted— when assessed at the rates included in the 2021 GL Policy—in an additional premium payment due from Defendant of $155,666.70. (D-SOF ¶ 6; Resp. to D-SOF ¶ 6.)

Sedgwick's third revised audit is the source of the key disputes relevant to the instant cross motions. On November 3, 2023, Defendant's insurance broker emailed the third audit results to Defendant for review. (ECF No. 37-6 at 10; ECF No. 37-3 ¶ 6.) Three days later, Defendant replied, taking issue with certain "per diem" payroll totals, deductions of "fringe benefits," and the

incorrect name used for an owner of the company.[12] (ECF No. 37-6 at 9–10; ECF No. 37-3 ¶¶ 6, 10.) The insurance broker forwarded these concerns to Brian Kingsley, Plaintiffs' senior premium auditor, who agreed to set up a call to discuss the additional corrections. (ECF No. 37-4 at 8–9.)

On November 9, 2023, representatives from Defendant and Defendant's broker participated in a conference call with representatives of Plaintiffs. The parties dispute what was discussed on this call. There is no dispute that Mr. Kingsley advised that Plaintiffs planned to bring "the audit process in-house" to address Sedgwick's errors and "finalize" the payroll audit themselves, so that Plaintiffs could "clear up any discrepancies." (D-SOF ¶¶ 9–10; Resp. to D-SOF ¶¶ 9–10.) However, Defendant asserts—relying exclusively on Kelly Ziegenfuss and Michael Egan's sworn declarations—that "Mr. Kingsley, acting on [Plaintiff Starr Surplus's] behalf, agreed that [Plaintiff] would honor Sedgwick's third revised audit subject only to the limited corrections discussed, and [Defendants] agreed to accept the audit on those terms." (D-SOF ¶ 11.) This would set Defendant's obligations, subject to the limited corrections, no higher than $155,666.70. (D-SOF ¶ 6; Resp. to D-SOF ¶ 6.) By contrast, Plaintiffs—relying only on Mr. Kingsley and Jacob Petre's sworn declarations—assert that Mr. Kingsley made no such promise to honor the third audit, instead averring that Mr. Kingsley only discussed Sedgwick's audit errors flagged in the initial email. (Resp. to D-SOF ¶ 11; ECF No. 37-2 ¶¶ 7–12; ECF No. 37-3 ¶¶ 10–15.) No other

---

[12] Defendant asserts that it was "prepared to accept the third revised audit subject only to two limited corrections: removal of per diem and fringe-benefit totals and correction of a name error incorrectly listing 'Mark Stewart' as an owner." (D-SOF ¶ 7.) Plaintiffs dispute that Defendant represented its willingness to accept the third audit results, or their own acquiescence to modify the written contract. (Resp. to D-SOF ¶ 7.) Based on the plain text of the email thread described above, Defendant makes no indication—whether to its insurance broker or to Plaintiffs—of its desire to accept the third revised audit results subject to limited corrections. (*See generally* ECF No. 37-4.) To the extent Defendant asserts that it represented this willingness to accept the revised third audit while on the November 9, 2023 call with Plaintiffs described above, that assertion does not raise a genuine dispute of material fact for the same reasons discussed in Section III.B.1.

record evidence weighs in on this bare he-said-she-said.[13]

Following the call, Plaintiffs conducted the promised in-house audit. (P-SOF ¶ 12; Resp. to P-SOF ¶ 12; *see also* ECF No. 18-3.) The in-house audit—relying on extensive documentation from Defendant—resulted in deductions related to Defendant's previous objections, among other things. (*Id.*; P-SOF ¶¶ 13, 18; Resp. to P-SOF ¶¶ 13, 18.) However, the in-house audit revealed that Sedgwick had previously applied a "New York State Payroll Limitation" in conducting the previous audits. (P-SOF ¶ 14; Resp. to P-SOF ¶ 14.) This limitation is only applicable in *workers' compensation* policies issued in New York, not *general liability* policies like the 2021 GL Policy. (P-SOF ¶¶ 14–16; Resp. to P-SOF ¶¶ 14–16.) In the final revised audit dated December 13, 2023, Plaintiffs corrected Sedgwick's error and removed the payroll limitation, resulting in a final owed premium of $684,859—or, less Defendant's $310,000 deposit, a total of $374,859 due and owing from Defendant.[14] (P-SOF ¶¶ 19–22; Resp. to P-SOF ¶¶ 19–22; ECF No. 18-3.) On January 25,

---

[13] There is no additional evidence to support Defendant's contention that—in contravention of the integration clause and modification requirements included in the 2021 GL Policy, *supra* note 6—Mr. Kingsley represented that Plaintiffs would honor the third amended Sedgwick audit amount (subject to the specified corrections) on the November 9 call. As discussed below, the declaration evidence alone is insufficient to raise a genuine dispute of material fact.

[14] Defendant contests Plaintiffs' assertion that the final, in-house audit was "properly conducted pursuant to Starr's Manuals of Rules, Classifications, Rates, and Rating Plans." (P-SOF ¶ 17; Resp. to P-SOF ¶ 17.) Defendant asserts—only in its response to Plaintiffs' statement of facts—that Plaintiffs did not properly conduct this final audit "in light of the prior audit revisions and representations [made on the November 9 conference call]." (Resp. to P-SOF ¶ 17.) Defendant cites no evidence and offers no specifics as to how Plaintiffs—in light of "prior audit revisions," which presumably means *Sedgwick's* previous errors—improperly calculated the final premium amount. The only evidence Defendant cites to are declarations describing the November 9 call, which make no reference to these purported errors. (*Id.*) In fact, Defendant otherwise concedes that the New York State Payroll Limitation should, in the normal course, only apply to workers' compensation policies and should have been excluded but for Sedgwick's error. (Resp. to P-SOF ¶¶ 14–16.) Moreover, Defendant's summary judgment brief makes no mention whatsoever of this argument about Plaintiffs' supposed "errors" in calculating this final premium, let alone the specifics of what Plaintiffs did wrong. (*See generally* Def. MSJ.) Because Defendant makes this argument that Plaintiffs did not properly apply its audit standards on the final audit (1) without citation to the record and (2) only in its response to Plaintiffs' statement of facts, it fails to raise a genuine dispute of material fact on this point. *See* L. Civ. R. 56.1(a); *Muraveva v. City of Wildwood*, No. 17-916, 2018 WL 6617266, at *1 n.2 (D.N.J. Dec. 18, 2018) (disregarding legal arguments made in statements of fact). To the extent Defendant's dispute is

7

2024, Plaintiff Starr Surplus issued its final audit to the wholesale broker for forwarding to the retail broker, and then to Defendant. (P-SOF ¶ 21; Resp. to P-SOF ¶ 21.) Defendant did not pay the amended amount. (P-SOF ¶ 23; Resp. to P-SOF ¶ 23.)

### B.    THE 2022 GENERAL LIABILITY AND WORKERS' COMPENSATION POLICIES

The parties' insurer-insured relationship was governed by two additional contracts: a 2022 general liability surplus lines insurance policy ("2022 GL Policy") for the period of June 1, 2022 to June 1, 2023, and a workers' compensation and employers liability insurance policy ("2022 WC Policy") for the same 2022–2023 time period. (P-SOF ¶¶ 24, 37; Resp. to P-SOF ¶¶ 24, 37.) The two separate contracts are reflected in Counts II and III, respectively. (*See generally* ECF No. 1.)

The 2022 GL Policy, issued by Plaintiff Starr Surplus, was subject to the same premium audit process as the 2021 GL Policy, but at a different rate per $1,000 of payroll: $425.4353 for New York and $261.5341 for all other states. (ECF No. 18-10 at 66; P-SOF ¶ 28; Resp. to P-SOF ¶ 28.) Instead of relying on Sedgwick, Plaintiff Starr Surplus conducted the payroll audit for the 2022 GL Policy itself, concluding that Defendant owed an additional $13,160 on top of their initial deposit. (P-SOF ¶¶ 30–35; Resp. to P-SOF ¶¶ 30–35.) Defendant did not pay this amount.[15]

The 2022 WC Policy was issued to Defendant by Plaintiff Starr Indemnity & Liability Corporation. (P-SOF ¶ 37; Resp. to P-SOF ¶ 37.) Defendant's final premium owed under the 2022 WC Policy was also determined by audit, although the parties do not provide specifics as to how

---

based on the same assertions about Plaintiffs' representations on the November 9 call, these too fail to raise a genuine dispute of material fact for the reasons explained below.

[15] In its response to Plaintiffs' statement of facts, Defendant contends that it "disputes that the amount asserted by Starr was due and owing and disputes Starr's characterization that it failed or refused to pay any amount." (Resp. to P-SOF ¶ 36.) However, Defendant offers no citation to the record to support its dispute and in no way contests Plaintiffs' assertions in its brief. (*Id.*; Def. MSJ); *Bobo*, 2017 WL 1416775, at *1 n.1. Moreover, Defendant later concedes in its own statement of facts that the dispute at issue "in Starr's Motion for Summary Judgment" centers on the *2021* GL Policy, not "the performance of audits under other policies," like the *2022* GL Policy. (D-SOF ¶ 16.) Accordingly, as discussed above, Defendant's factual dispute is neither genuine nor material as to Count II.

this workers' compensation audit is conducted. (P-SOF ¶¶ 38–41; Resp. to P-SOF ¶¶ 38–41); *but see Travelers Indem. Co. v. Kenvil Steel Prods., Inc.*, No. L-1675-06, 2009 WL 170087, at *1 (N.J. Super. Ct. App. Div. Jan. 27, 2009) (per curiam) (explaining similar process for workers' compensation payroll audit). Nonetheless, as Starr Surplus did with the 2022 GL Policy, Starr Indemnity conducted its audit for the 2022 WC Policy itself, concluding that Defendant owed an additional $8,047. (P-SOF ¶¶ 41–45; Resp. to P-SOF ¶¶ 41–45.) Defendant, again, did not pay this amount.[16]

### C.   PROCEDURAL HISTORY

On August 1, 2024, Plaintiffs, invoking this Court's diversity jurisdiction under 28 U.S.C. §1332(a)(1), filed their Complaint with three breach of contract claims against Defendant for the outstanding premiums, plus interest, under the three insurance contracts: $374,859 under the 2021 GL Policy, $13,160 under the 2022 GL Policy, and $8,047 under the 2022 WC Policy. (*See generally* ECF No. 1.) Defendant answered, raising three affirmative defenses relevant to this appeal: Plaintiffs' unclean hands, the risk of unjust enrichment if Plaintiffs received "more money than they are entitled to receive," and equitable estoppel. (ECF No. 9 at 7.) After discovery and unsuccessful attempts at settlement, the cross motions are now ripe for decision. (Pls. MSJ; Def. MSJ; ECF No. 38.)

### II.   **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[16] As it did in its response to Plaintiffs' statement of facts with reference to the amount due under the 2022 GL Policy, Defendant contends that it "disputes Starr's characterization that it failed or refused to pay any amount alleged to be due and owing." (Resp. to P-SOF ¶ 46.) For the reasons stated above, noting in particular Defendant's concession that it only disputes the outstanding premiums under the 2021 GL Policy, Defendant fails to raise a genuine dispute of material fact as to Count III. *See supra* note 15.

to judgment as a matter of law." Fed. R. Civ. P. 56(a). Put another way, "[s]ummary judgment is designed . . . to assess whether a genuine issue of material fact exists and whether a trial is necessary." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the party seeking summary judgment carries its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256. "[A] plaintiff cannot resist a properly supported motion for summary judgment merely by restating the allegations of his complaint," *Orsatti*, 71 F.3d at 484 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)), and a court's duty to view all facts and inferences in the light most favorable to the nonmoving party does not extend to "the mere allegations or denials of his pleadings" unsupported by factual evidence, *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268 (3d Cir. 2014)). "Nor will '[b]are assertions, conclusory allegations, or suspicions' suffice." *Id.* (alteration in original) (quoting *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018)); *see also Jackson v. Danberg*, 594 F.3d 210, 228 (3d Cir. 2010) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (internal quotation marks omitted)). Likewise, the movant may establish entitlement to judgment as a matter of law by showing that the plaintiff's evidence is insufficient to establish an essential element of his claim. This showing "necessarily renders all other facts immaterial," such that "there can be no genuine issue as to any material fact" for a jury to decide. *Celotex*, 477 U.S. at 323 (internal quotation

10

marks omitted).

## III.    DISCUSSION

The dispositive issue in this case is whether the parties' factual dispute about the November 9, 2023 conference call creates a genuine dispute of material fact to preclude summary judgment for Plaintiffs. It does not. Accordingly, the Court grants summary judgment in favor of Plaintiffs.

### A.    PLAINTIFFS SATISFY THEIR BURDEN AT SUMMARY JUDGMENT

As an initial matter, Defendant does not contest anywhere in its brief that summary judgment is inappropriate with respect to Counts II and III of Plaintiffs' Complaint for breach of the 2022 GL Policy and the 2022 WC Policy. (*See generally* Def. MSJ; *see also* D-SOF ¶ 16 (conceding that the instant dispute centers on the 2021 GL Policy).) "As such, the Court will grant summary judgment as unopposed as to those claims." *Cordial v. Atlantic City*, No. 11-1457, 2014 WL 1095584, at *11 (D.N.J. Mar. 19, 2014). Even if Defendant had opposed summary judgment on these claims, Plaintiffs have readily satisfied their burden that "no reasonable trier of fact could find other than for the moving party" to prevail on their motion for summary judgment. William W. Schwarzer, *Summary Judgment Under the Federal Rules*, 99 F.R.D. 465, 488 (1983).

"[T]o succeed on a breach of contract claim in the context of summary judgment, New Jersey law requires the moving party to show that no genuine dispute of fact exists as to '(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations.'" *Advanced Drainage Sys., Inc. v. Siteco Materials, Inc.*, No. 13-1349, 2014 WL 5512886, at *6 (D.N.J. Oct. 31, 2014) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007)). Without opposition, Plaintiffs have plainly demonstrated no genuine disputes of material fact as to (1) the existence of its 2022 GL Policy and WC Policy contracts with Defendant, (2) breaches of those contracts by Defendant for failure to pay its premiums, (3) evidence of damages resulting from those breaches

11

totaling $21,207, and (4) their providing insurance coverage to Defendant for the duration of those policies. (*See* P-SOF ¶¶ 24–46; *supra* notes 15–16.) Accordingly, the Court grants Plaintiffs summary judgment on Counts II and III of their Complaint.

Plaintiffs have also met their burden at summary judgment with respect to Count I, their claim for breach of contract under the 2021 GL Policy. (ECF No. 1 ¶¶ 58–63.) Plaintiffs have provided the signed 2021 GL Policy between the parties, which shows that Plaintiff Starr Surplus issued Defendant a year of surplus lines coverage. (2021 GL Policy.) Plaintiffs have shown that— despite Defendant's plain obligations to pay an additional premium above $310,000 following Starr Surplus' annual payroll audit at specified rates, (*id.* at 7, 64)—Defendant did not pay that outstanding amount owed to Plaintiffs, which Starr Surplus calculated as $374,859, (ECF No. 18-3 (Brian Kingsley's audit worksheet for Defendant's payrolls); ECF No. 18-9 (converting payroll audit to outstanding premium owed)).

Across each of their three claims, Plaintiffs have satisfied their burden to demonstrate total damages of $396,066. Under New Jersey law, the award of pre-judgment interest is a matter of discretion of the trial court. *County of Essex v. First Union Nat'l Bank*, 891 A.2d 600, 608 (N.J. 2006) (citations omitted). Consistent with how other district courts have exercised that discretion, the Court will begin to calculate pre-judgment interest from the filing of the complaint. *U.S. for Use of Colo. Custom Rock Corp. v. G&C Fab-Con, LLC*, No. 20-2968, 2024 WL 4356306, at *16 (D.N.J. Oct. 1, 2024), *aff'd*, No. 24-3053, 2025 WL 3090745 (3d Cir. Nov. 5, 2025); *id.* at *12 (explaining that "the law of the forum—New Jersey law—applies" in determining pre-judgment interest (citing *Gleason v. Norwest Mortg., Inc.*, 253 F. App'x 198, 203–04 (3d Cir. 2007))). Using the rate set by the New Jersey Cash Management Fund, the Court calculates the total pre-judgment interest on this $396,066—beginning on August 1, 2024 with the filing of Plaintiffs' Complaint,

12

(ECF No. 1), and running to the date of this judgment—to be $35,358.39. *Id.* at \*15; *see* N.J. Ct. R. 4:42-11(a); *Post-Judgment and Pre-Judgment Interest Rates*, N.J. Courts (May 31, 2026), https://www.njcourts.gov/sites/default/files/courts/civil/postprejudgmentrates.pdf.

## B.    DEFENDANT'S OPPOSITION AND CROSS MOTION

Because Plaintiffs have met their initial burden to establish a breach of contract claim on Count I, the burden then shifts to Defendant to "identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial." *Advanced Drainage Sys., Inc.*, 2014 WL 5512886, at \*4 (citing *Celotex*, 477 U.S. at 324).

As stated repeatedly herein, Defendant's opposition and cross motion only relate to Count I of Plaintiff's Complaint, Defendant's breach of the 2021 GL Policy. (Def. MSJ at 2.) Defendant does not dispute that the 2021 GL Policy contract says what it says about requiring payroll audits. (Resp. to P-SOF ¶¶ 3–5, 7–8.) It nowhere argues in its brief that Plaintiffs' interpretation of the standard payroll audit process is incorrect; in particular, Defendant does not contest that the "New York State Payroll Limitation" initially applied in Sedgwick's audits is inapplicable to a general liability payroll audit. (*See generally* Def. MSJ; Resp. to P-SOF ¶¶ 14–16; *see also supra* notes 9, 14.) Defendant also offers no argument in its brief and identifies no facts in the record to suggest that Plaintiff's asserted amount due, $374,859, is inconsistent in any way with the audit process prescribed by the 2021 GL Policy or with standard industry practice. *See supra* note 14.

Instead, Defendant's position with respect to the premium owed under the 2021 GL Policy relies almost entirely on its assertions about the November 9, 2023 conference call. *But see supra* notes 7, 10. As explained above, Defendant contends that on that call, Brian Kingsley, Plaintiffs' senior premium auditor, "agreed that [Plaintiff] would honor Sedgwick's third revised audit subject only to the limited corrections discussed, and [Defendants] agreed to accept the audit on those terms." (D-SOF ¶ 11.) This would limit Defendant's premium owed to $155,666.70,

13

compared to Plaintiffs' later asserted amount of $374,859. (D-SOF ¶¶ 6, 12; Resp. to D-SOF ¶¶ 6, 12.)

Defendant argues that this alleged representation by Mr. Kingsley precludes summary judgment for Plaintiffs on Count I of their Complaint (or, alternatively, entitles Defendant to summary judgment on its affirmative defenses) for three reasons. First, Defendant argues that its version of events raises a genuine dispute of material fact as to whether the parties "reached an agreement to resolve the audit for the 2021 General Liability Policy" consistent with the lower premium total. (Def. MSJ at 6.) Second, Defendant argues that Plaintiffs' supposed conduct on the November 9 conference call, the "extreme premium rate" charged in the 2021 GL Policy, and Plaintiffs' "omission of a surplus lines notice" from the policy collectively violated the implied covenant of good faith and fair dealing implicit in ever contract under New Jersey law. (*Id.* at 6–9.) Finally, Defendant argues that its contentions about the November 9 conference call entitle it to summary judgment on its affirmative defenses: unclean hands, unjust enrichment, and equitable estoppel. (*Id.* at 9–11.)

### 1.    Oral Modification of the 2021 GL Policy

Even construing the facts in the light most favorable to Defendant,[17] its contentions about Mr. Kingsley's representations on the November 9, 2023 call are insufficient to create a genuine dispute of material fact. The 2021 GL Policy plainly specifies that "all the agreements between [Defendant] and [Plaintiff Starr Surplus] concerning the insurance afforded" are contained within the 2021 GL Policy. (ECF No. 18-10 at 14.) Further, "[t]he policy's terms can be amended or

---

[17] Although Defendant is separately cross moving for summary judgment on its affirmative defenses, its brief is also an opposition to the Court's entry of summary judgment for Plaintiff. (*See generally* Def. MSJ.) Accordingly, where Defendant is merely the non-movant—as it is with its non-affirmative defense arguments—it is entitled to "all justifiable inferences [about the facts] to be drawn in [its] favor." *Anderson*, 477 U.S. at 255.

14

waived only by endorsement issued by [Plaintiff Starr Surplus] and made a part of this policy." (*Id.*) Defendant's assertion—essentially, that the parties modified the requirements of the 2021 GL Policy[18]—contravenes this plain contractual language. *Bonnieview Homeowners Ass'n v. Woodmont Builders, LLC*, 655 F. Supp. 2d 473, 509 (D.N.J. 2009) ("Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." (quoting *Bohler-Uddeholm Am. Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001)). Nonetheless, under New Jersey law, parties "may orally agree to modify a written contract (even one that expressly prohibits oral modifications)." *Hutler v. Marina at Southwinds, LLC*, No. A-5877, 2016 WL 5929265, at *5 (N.J. Super. Ct. App. Div. Oct. 12, 2016) (citing *Lewis v. Travelers Ins. Co.*, 239 A.2d 4, 9 (N.J. 1968)). However, this subsequent oral modification must be proven by clear and convincing evidence. *Id.* at *5 n.14 (citing *Home Owners Constr. Co. v. Glen Rock*, 169 A.2d 129, 135 (N.J. 1961)).

Defendant has not met this burden. *See Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 522 (3d Cir. 2004) ("Consequently, where the clear and convincing evidence standard applies, the trial judge must inquire whether the evidence presented [at summary judgment] is such that a jury applying that evidentiary standard could find only for one side."). The only evidence in the record

---

[18] Defendant is imprecise as to whether the November 9 call allegedly (1) *modified* the terms of the *existing* 2021 GL Policy or (2) gave rise to an entirely *new contract* between the parties. (*See* Def. MSJ at 5–7.) The Court explains above why the former argument—subsequent oral modification of an integrated contract— is insufficient. Should Defendant have meant the latter—that the November 9 call gave rise to an *entirely new* oral contract—this new contract (for which Defendant has asserted no counterclaim of breach) would be barred by the preexisting legal duty rule, as Defendant was already under a contractual duty to pay Plaintiff the insurance premium for the year of surplus lines coverage. *See, e.g., Segal v. Lynch*, 48 A.3d 328, 342 (N.J. 2012) ("[C]onsideration cannot be a promise to perform a pre-existing duty." (citing 3 Williston on Contracts § 7:37 (4th ed. May 2026 update))); *see also Carrington Mortg. Servs., LLC v. Crismali*, No. A-4757-17T4, 2019 WL 2896223, at *3 (N.J. Super. Ct. App. Div. July 5, 2019) ("The premise that the modification agreement is a contract separate and apart from the original loan agreement is incorrect. The modification agreement is not a substituted contract. . . . The purpose of a contract modification is to simultaneously alter the terms of a prospective performance owed yet maintain an existing contractual relationship." (citing 13 Corbin on Contracts § 71.1(1) (Jenkins ed. 2003))).

supporting Defendant's contention that Mr. Kingsley and Defendant's representatives agreed to a contractual modification are the declarations of Kelly Ziegenfuss and Michael Egan. (D-SOF ¶ 11; ECF No. 36-4 ¶ 11; ECF No. 36-5 ¶¶ 17–18).) These self-serving, largely conclusory declarations are insufficient to create *any* genuine dispute of material fact, let alone one that satisfies Defendant's heightened evidentiary burden. *See Gonzalez v. Sec'y of Dept. of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012); (ECF No. 36-4 ¶ 11 (averring largely conclusory assertion that "[a]ll participants on the call confirmed their mutual understanding and agreement" of a contractual modification); ECF No. 36-5 ¶ 17 ("Mr. Kingsley further confirmed during the call that Starr would honor the third revised audit issued by Sedgwick, subject only to the limited corrections discussed, and that no further substantive revisions were anticipated."); ECF No. 36-5 ¶ 18 ("[Defendant] accepted those terms and understood that the audit issues relating to the 2021 General Liability Policy were resolved on that basis.").)

Assuming, *arguendo*, that these three paragraphs of the declarations did create a reed-thin factual dispute, they do not satisfy Defendant's burden of providing clear and convincing evidence.[19] *See Coastal Jersey Holdings, LLC v. Giordano*, No. 22-2024, 2023 WL 7545301, at *9–10 (D.N.J. Nov. 14, 2023) (finding that contemporaneous letter between parties "recapitulating" modification and deposition testimony were insufficient to be clear and

---

[19] Defendant's thin evidentiary offering is particularly unavailing where none of the contemporaneous correspondence between the parties suggested that Plaintiffs planned to honor the third revised audit after the November 9 call. In an email between Brian Kingsley and Defendant on November 13, Mr. Kingsley stated that he was "starting work on the [in-house] audit" and had questions regarding Defendant's "fringe payments"—one of the several topics discussed by the parties on the conference call. (*See* ECF No. 37-6 at 7.) The email makes no mention of a plan to honor Sedgwick's third revised audit, or that the in-house audit would comply with a specific agreement made on the call. (*Id.*) Moreover, in an internal email on November 30, Mr. Kingsley discussed (1) the in-house audit's decision to *reject* Defendant's request for deducting fringe payments and (2) the need to correct the exact New York State Payroll Limitation that Sedgwick had improperly included in its audit. (*Id.* at 5.) Both of these decisions are inconsistent with the supposed oral modification Defendant asserts occurred on the November 9 call, and this contemporaneous email thread only further undercuts Defendant's self-serving contractual modification theory.

convincing evidence and granting summary judgment to plaintiff); *Finocchiaro v. D'Amico*, 73 A.2d 260, 261 (N.J. Super. Ct. App. Div. 1950) (overturning jury verdict where "[t]he only evidence concerning the alleged oral agreement came from the lips of the defendant. His testimony in this respect was neither clear nor convincing"); *905 Mountain Ave., LLC v. Hillside Seafood House, Inc.*, No. A-0921-22, 2024 WL 1046852, at *5 (N.J. Super. Ct. App. Div. Mar. 11, 2024) (per curiam) (finding testimony of oral modification alone insufficient); *cf Am. Motorists Ins. Co. v. N. Plainfield Bd. of Educ.*, No. A-4680, 2016 WL 6122867, at *9 (N.J. Super. Ct. App. Div. Oct. 20, 2016) (affirming trial court's finding of clear and convincing evidence where the parties' conduct following alleged modification was consistent with that modification). Because Defendant does not present clear and convincing evidence of the alleged oral modification of the 2021 GL Policy, it fails to raise a genuine dispute of material fact precluding summary judgment on those grounds.

### 2.    The Implied Covenant of Good Faith and Fair Dealing

Defendant next argues that Plaintiffs breached the implied covenant of good faith and fair dealing. Defendant asserts that, after Plaintiffs' promise to honor the premium calculated in the third Sedgwick audit, Plaintiffs' "delayed reversal that more than doubled the premium" constituted bad faith and unfair dealing with Defendant. (Def. MSJ at 7.) Defendant also argues that the 2021 GL Policy's "extreme premium" rate compared to similar policies and Plaintiffs' failure to include a "surplus lines notice" in the policy further suggest Plaintiffs' breach of the implied covenant. (*Id.* at 7–9.)

Defendant may not raise its breach of the implied covenant of good faith and fair dealing counterclaim for the first time at summary judgment. "Under New Jersey law, every contract has an implied covenant of good faith and fair dealing." *Scagnelli v. Schiavone*, 538 F. App'x 192 (3d Cir. 2013) (citing *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1126–27 (N.J. 2001)). A claim

17

for breach of this implied covenant—as distinct from a bona fide breach of contract claim—may be asserted in specific circumstances, including "to rectify a party's unfair exercise of discretion regarding its contract performance." *InfuCare Rx, Inc. v. Roy*, No. 22-6342, 2024 WL 4542226, at *11 (D.N.J. Oct. 22, 2024) (quoting *Ohm Sys., Inc. v. Senergene Sols., LLC*, No. 23-1340, 2023 WL 8437279, at *6–7 (D.N.J. Dec. 5, 2023)). A party may not, however, defeat summary judgment "by alleging claims not raised in [its] pleading." *Camp v. Brennan*, 54 F. App'x 78, 81 n.2 (3d Cir. 2002); *Laplace v. Laplace*, No. 03-4291, 2006 WL 83110, at *4 n.14 (D.N.J. Jan. 12, 2006) ("Defendant cannot now assert a counterclaim in his motion for summary judgment."), *aff'd sub nom.*, *Laplace v. Est. of Laplace ex rel. Laplace*, 220 F. App'x 69 (3d Cir. 2007); *see also Dunn v. Premier Cap., Inc.*, No. 11-5625, 2013 WL 3466826, at *4 (D.N.J. July 9, 2013) (holding the same for affirmative defenses).

Here, Defendant's answer does not raise Plaintiffs' purported breach of the implied covenant of good faith and fair dealing in any way, either as an independent counterclaim or as an affirmative defense.[20] (*See generally* ECF No. 9.) In fact, Defendant's answer includes no counterclaims *at all.* (*Id.*) Defendant's failure to raise the implied covenant precludes its late-breaking deployment at summary judgment. *See Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 74 (3d Cir. 1972). Accordingly, it does not raise a genuine dispute of material fact on those grounds.[21]

---

[20] Case law suggests that the implied covenant of good faith and fair dealing is an independent cause of action in New Jersey, not an affirmative defense. *See Wilson*, 773 A.2d at 1126–31 (discussing as an independent cause of action); *InfuCare Rx, Inc.*, 2024 WL 4542226, at *10–11 (same); N.J. Model Jury Charges (Civil), 4.10N "Affirmative Defenses" (1999) (not listing the implied covenant as an affirmative defense to a contract action). Regardless, any discussion of such a covenant is omitted from Defendant's answer, by way of affirmative defense or counterclaim, and it may not raise the basis for the first time at summary judgment. (*See* ECF No. 9.)

[21] Even if Defendant had raised this implied covenant in its answer, it would not prevent summary judgment. Under New Jersey law, "[t]he party claiming a breach of the covenant of good faith and fair dealing 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has

### 3.     Defendant's Affirmative Defenses

Defendant's final argument relates to its affirmative defenses which, unlike the implied covenant of good faith and fair dealing, it properly included in its answer. (*See* Def. MSJ at 9–11; ECF No. 9.) A defendant seeking summary judgment on an affirmative defense bears the burden of proof to "establish beyond peradventure all essential elements of the defense to warrant judgment in his favor." *Green v. Phila. Cnty. Prisons*, No. 00-5330, 2006 WL 2869527, at *6 (E.D. Pa. Oct. 4, 2006) (cleaned up) (quoting *Chapin v. Nationscredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002)); *Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*, 979 F.2d 1579, 1582 (3d Cir. 1992) (finding that if movant for summary judgment bears burden of proof on issue, it must "establish the absence

engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005) (quoting 23 Williston on Contracts, § 63:22 (4th ed. May 2026 update)). "Proof of 'bad motive or intention' is vital to an action for breach of the covenant." *Id.* (quoting Wilson, 773 A.2d at 1130)). As Defendant concedes, the "benefit of the bargain originally intended by the parties" in the 2021 GL Policy did not include the New York State Payroll Limitation that Sedgwick incorrectly applied to its premium audits, as that limitation only applies to worker's compensation audits. *Id.* (quoting 23 Williston on Contracts, § 63:22 (4th ed. May 2026 update)); (Resp. to P-SOF ¶¶ 14–16.) To the extent that Defendant argues that this inapplicable limitation should have applied because of Sedgwick's previous mistakes, Defendant essentially asks the Court to grant it a windfall at odds with the 2021 GL Policy and Plaintiffs' standard audit procedures. Plaintiffs did not "den[y Defendant] the benefit of the bargain originally intended by the parties" by requiring Defendant to pay the correct premium amount. *Brunswick Hills Racquet Club, Inc.*, 864 A.2d at 396 (quoting 23 Williston on Contracts, § 63:22 (4th ed. May 2026 update)). In the absence of any record evidence that Plaintiffs acted with "bad motive or intention," Defendant has failed to substantiate its assertion that Plaintiffs breached the implied covenant of good faith and fair dealing. *Wilson*, 773 A.2d at 1130.

Defendant's further arguments about the terms of the 2021 GL policy—notably, the policy's increased premium rate and lack of "surplus lines" notice—are also meritless. Plaintiff Starr Surplus, as a surplus lines insurer, is in the business of insuring dangerous, otherwise uninsurable conduct. *See United States v. Northumberland Ins. Co., Ltd.*, 521 F. Supp. 70, 72 n.3 (D.N.J. 1981). It is explicitly authorized to charge "any rate the market will bear" to Defendant for Defendant's highly technical, risky drilling work. *See Evanston Ins. Co., Inc. v. Merin*, 598 F. Supp. 1290, 1298 (D.N.J. 1984); (2021 GL Policy at 6.) Defendant in no way suggests that Plaintiffs deceived it about the premium rate or improperly induced Defendant to accept the rate under duress. Defendant only argues that it was charged more than the rates in preceding and subsequent years—a contention that, as explained, fails to raise any genuine dispute of material fact. *See supra* note 10. Moreover, Defendant's contention that Plaintiff Starr Surplus was obligated to provide "surplus lines notice" in the 2021 GL Policy as a nebulous indicator of Plaintiffs' bad faith is at odds with the plain language of the New Jersey Administrative Code, which places that notice obligation on surplus line "producers"—like Defendant's insurance broker—not "insurers"—like Plaintiff Starr Surplus. *See supra* note 7.

19

of a genuine factual issue . . . even if no opposing evidentiary matter is presented" (citation omitted)). Here, Defendant seeks summary judgment on three affirmative defenses: unclean hands, unjust enrichment, and equitable estoppel. (Def. MSJ at 9–11.) All three of these bases for summary judgment fail.

*First*, the doctrine of unclean hands does not apply to claims sounding in law, only those brought in equity. *See A. Hollander & Son v. Imperial Fur Blending Corp.*, 66 A.2d 319, 323 (N.J. 1949) ("'He who comes into equity must come with clean hands,' [is] known as the 'clean hands doctrine.'"); *id.* at 324 ("A suitor *in equity* must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings." (emphasis added)); *Sprenger v. Trout*, 866 A.2d 1035, 1045 (N.J. Super. Ct. App. Div. 2005) ("[U]nclean hands is an equitable remedy and is not an available defense to claims for monetary relief."). Here, because all three of Plaintiffs' breach of contract claims sound in law and seek monetary relief, Defendant's equitable defense of unclean hands is inapplicable as a matter of law. (*See generally* ECF No. 1); *Sprenger*, 866 A.2d at 1045; *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1245 (3d Cir. 1994) ("An action for money damages based on a breach of contract is traditionally a legal claim."); *Starland v. Fusari*, No. 10-4930, 2013 WL 12149123, at *11 (D.N.J. Nov. 15, 2013) (holding that unclean hands defense was inapplicable to breach of contract claims).

*Second*, Defendant's affirmative defense of unjust enrichment suffers from a myriad of deficiencies. To state a claim for unjust enrichment in New Jersey, a party must show that the other "received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994). This doctrine is quasi-contractual and only available "in the absence of an agreement providing for compensation." *Briggs v. Luisi*, 2006 WL 1476929, at *4 (N.J. Super. Ct. App. Div. May 22, 2006). Here, the basis of Defendant's unjust

20

enrichment defense is not Plaintiffs *currently* retaining a benefit to which they are not entitled, but instead is based on the money Plaintiffs *"would receive"* if they were successful in the instant action. (ECF No. 9 at 7 (emphasis added).) Defendant does not assert that Plaintiffs "have something" pursuant to the 2021 GL Policy they should not; Defendant did not pay any portion of the demanded premium. Defendant cannot rely on this forward-looking, case-dependent form of unjust enrichment. *See VRG Corp.*, 641 A.2d at 526 (requiring *"retention* of [a] benefit" for unjust enrichment (emphasis added)); *PMX Jewels Ltd. v. Ruvanni Inc.*, No. 14-243, 2014 WL 1725733, at \*2 (E.D. Pa. May 1, 2014) (explaining that "[o]ther courts have consistently found future benefits cannot be the basis of an unjust enrichment claim" and collecting cases). Even assuming, *arguendo*, Plaintiffs retained some benefit they did not deserve, Defendant cannot raise an unjust enrichment claim where the parties' relationship is governed by an express contract. *Briggs*, 2006 WL 1476929, at \*4; *Celularity Inc. v. Evolution Biologyx, LLC*, No. 23-2135, 2026 WL 878345, at \*21 (D.N.J. Mar. 31, 2026). Had Defendant wanted to challenge Plaintiffs' conduct *vis-à-vis* the 2021 GL Policy as it attempted with its unjust enrichment claim, it had to do so through asserting a breach of contract counterclaim.

*Finally*, Defendant does not meet its burden to assert equitable estoppel. "Equitable estoppel requires proof of misrepresentation of material facts, or concealment thereof, known to the party sought to be estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and upon which the other party reasonably and justifiably relies, to its detriment." *Eileen T. Quigley, Inc. v. Miller Family Farms, Inc.*, 629 A.2d 110, 117 (N.J. Super. Ct. App. Div. 1993); *see also Miller v. Miller*, 478 A.2d 351, 355 (N.J. 1984). New Jersey Courts have explained that the doctrine "is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied

21

to his detriment." *Est. of Massi v. Barr*, No. A-2005-21, 2024 WL 3277519, at \*18 (N.J. Super. Ct. App. Div. June 28, 2024) (quotation omitted). The key, thus, in contrast to the related doctrine of contractual waiver, is "the reliance of one [party] upon another." *Scibek v. Longette*, 770 A.2d 1242, 1250 (N.J. Super. Ct. App. Div. 2001); 4 Williston on Contracts § 8:3 (4th ed. May 2026 update) (equitable estoppel based on premise that "permitting the party making the representation to deny it would cause injury *by virtue of the reliance*" (emphasis added)).

Nowhere in Defendant's statement of facts does it indicate that it "change[d its] position to [its] detriment" following the November 9 conference call with Plaintiffs. *Miller*, 478 A.2d at 355. Defendant only asserts that, after the conference call, Plaintiffs "issued a final audit that materially departed from the third revised audit it had agreed to honor." (D-SOF ¶ 12.) Defendant offers no record evidence that it had changed its position in any way; Defendant did not even pay the $155,666.70 that it claims it owed on the 2021 GL Policy. (*See generally* D-SOF.) To the extent Defendant asserts that it relied on Plaintiffs' supposed representations "by accepting the audit as resolving the dispute," (Def. MSJ at 11), this assertion in no way suggests that Defendant "change[d its] position to [its] detriment"[22] *Miller*, 478 A.2d at 355.. Based on the record before the Court, Defendant did not do *anything* after the November 9 call. This lack of reliance is fatal to its equitable estoppel defense. *Id*; *cf Travelodge Hotels, Inc. v. Honeysuckle Enters., Inc.*, 357 F. Supp. 2d 788, 800 (D.N.J. 2005) (holding that deposition testimony about reasonable reliance to detriment was sufficient to preclude summary judgment). Thus, because each of Defendant's affirmative defenses fail for the reasons outlined above, its cross motion for summary judgment on those claims is denied.

---

[22] Such an assertion is also at odds with Defendant's acknowledgement that Plaintiff Starr Surplus still needed to complete the in-house audit. (D-SOF ¶ 10.) If the third Sedgwick audit truly resolved the dispute between the parties, then a subsequent in-house audit by Starr Surplus would serve no purpose.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED**. An appropriate Order accompanies this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: June 8, 2026